**Mary FRIESS, Plaintiff,**

v.

**RELIANCE STANDARD LIFE INS. CO., et al., Defendants.**

**No. CIV.A. 99–5010.**

United States District Court, E.D. Pennsylvania.

Nov. 28, 2000.

Arelene Glenn Simolile, Rachael Benner DeAngelo, Arlene Glenn Simolile & Assoc., Philadelphia, PA, for plaintiff.

Joshua Bachrach, Rawlet & Henderson, Philadelphia, PA, for defendants.

### EXPLANATION AND ORDER

ANITA B. BRODY, District Judge.

Before me is defendant's motion for summary judgment. For the reasons set forth below, defendant's motion will be denied without prejudice.

Plaintiff Mary Friess brought this action against the defendant, Reliance Standard Life Insurance Company ("Reliance") following Reliance's denial of her claim for long-term disability ("LTD") benefits. Because the insurance policy at issue is an employee benefit plan, this action is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* Removal was proper as ERISA provides that a civil action may be brought in federal court by a plan participant "to recover benefits due to him under the terms of the plan...." 29 U.S.C. § 1132(a)(1)(B). ERISA preempts all state claims that "relate to any employee benefit plan." 29 U.S.C. § 1144(a).

### Factual Background [1]

Woodward and Lothrop established and maintained a benefit plan offering LTD benefits to its employees. As an employee of Woodward and Lothrop,[2] Friess participated in the plan. Her coverage under the plan became effective in 1989.[3]

Woodward and Lothrop's plan was insured under a group LTD policy ("the Policy") issued and administered by Reliance. The Policy states that Reliance will pay a monthly benefit if an insured:

1. As appropriate at summary judgment, the following facts, where controverted, are construed in the manner most favorable to the plaintiff as non-moving party.

2. Friess was a merchandise associate at John Wanamaker's, a division of Woodward and Lothrop, at the time of her allegedly disabling injury.

3. The parties do not dispute the fact that Friess had coverage under the LTD Policy.

In 1989, through her employer, Friess applied for LTD insurance with Reliance. She opted for the coverage that provided benefits equivalent to 60% of her salary should she become disabled. Answer to Defendant's Motion for Summary Judgment, Exhibit A. Friess allegedly paid the premiums, through a payroll deduction, from 1989 until the date of her accident in May 1994.

(1) is Totally Disabled as the result of a Sickness or Injury covered by this Policy; (2) is under the regular care of a Physician; (3) has completed the Elimination Period; and (4) submits satisfactory proof of Total Disability to us.

Defendant's Motion for Summary Judgment, Exhibit B, p. 7.0. According to the Policy, an employee is "Totally Disabled" when "during the Eliminator Period and thereafter an Insured cannot perform the material duties of any occupation.... Any occupation is one that the Insured's education, training or experience will reasonably allow." *Id.* at 2.1. An insured who is "Partially Disabled"—capable of performing the material duties of any occupation on a part-time basis or some of the material duties on a full-time basis—will be considered Totally Disabled, the definition continues, except during the "Elimination Period." The "Elimination Period" is defined as a period of 90 consecutive days of Total Disability for which no benefit is payable, and begins on the first day of Total Disability. *Id.* at 1.0–2.0.

On January 19, 1996, Friess submitted a claim for LTD benefits under the Policy. Friess maintained that she had become totally disabled on May 25, 1994, when she fell from a platform at work and broke her left ankle. In her motion, plaintiff indicates that she had expected the injury to heal, allowing her to return to work. However, her doctors eventually determined that the ankle injury was permanent, as her severe pain and difficulty walking and standing did not subside. Following the determination that the inju-

ry was permanent, Friess filed her claim with Reliance in January of 1996.[4]

After receiving Friess's claim in January of 1996, Reliance opened a file on Friess and began obtaining medical records from her treating physicians. At Reliance's request, Friess provided the necessary medical releases and authorizations, and also provided Reliance with contact information concerning the doctors she had seen after the ankle injury. Based on the information provided by Friess, Reliance undertook to contact those doctors to obtain necessary records and evaluations.

The compiled medical records document problems with Friess's left ankle and foot dating from November 28, 1994, when William Markmann, M.D. began treating Friess for those problems.[5] However, Friess maintains that her medical treatment began immediately following her fall on May 25, 1994. On the day of the fall, she was taken to the emergency room at Nazareth Hospital and treated for an ankle injury. On the next day, May 26, 1994, Friess saw Dr. Thomas Peff for treatment. Dr. Peff treated Friess over the next several months. During that time, Dr. Peff put a cast on the ankle and had Friess perform physical therapy.

In November of 1994, Dr. Markmann's practice assumed care for Friess. The record of his November 28, 1994 evaluation[6] indicates that Friess described her earlier treatment under Dr. Peff to Dr. Markmann. Friess also provided Dr. Markmann with x-rays she brought with her from Dr. Peff's office. Friess complained to Dr. Markmann of persistent pain in her left ankle and foot that made

---

4. Since the accident, Friess has made successful claims for worker's compensation and Social Security disability benefits. Friess has been receiving worker's compensation benefits since May 25, 1994, the day of the fall at work. Reliance was aware of the worker's compensation claim, but maintains that Friess did not give Reliance a copy of the file made by the worker's compensation insurance carrier. On April 14, 1999, the Social Security Administration ("SSA") awarded Friess disability benefits.

5. The medical records indicate that Friess saw Dr. Markmann in early 1989 for problems with her left ankle. As Reliance does not claim that its denial of benefits was predicated on a finding of preexisting condition, however, that evidence is not relevant.

6. Defendant's Motion for Summary Judgment, Exhibit D.

walking and standing difficult. Dr. Markmann ordered an MRI[7] scan of her ankle and foot and also an EMG[8] of her back and left leg. On December 20, 1994, Markmann prescribed Percodan in response to Friess's request for pain relief.

On December 28, 1994, I.M. Solanki, M.D. conducted the MRI.[9] The records of both Dr. Solanki and Dr. Markmann indicate that the MRI study was normal.

In January of 1995, Dr. John Beight, another doctor in the same practice group as Dr. Markmann, examined Friess.[10] His records indicate that Friess continued to complain of persistent pain in her foot. He agreed with Dr. Markmann that she should have an EMG. In notes dated January 20, 1995, Dr. Beight wrote that he believed Friess could work in a seated position. However, Friess's attempt to resume work in late January 1995 intensified her pain. On January 27, 1995, Beight recorded his belief that it would be unwise for Friess to continue working if her pain continued to worsen.

The record indicates that Bruce Grossinger, D.O. conducted an EMG on February 3, 1995.[11] Dr. Grossinger concluded that the study was abnormal, indicating mild partial entrapment of the left peroneal nerve.[12] Dr. Grossinger recorded his opinion that the nerve injury occurred in the context of the work accident on May 25, 1995.

The record also included a standard Reliance attending physician evaluation form completed by Dr. Beight at some point in 1996.[13] On the evaluation form, Dr. Beight diagnosed Friess with left ankle avulsion and entrapment of the peroneal nerve; he also noted her pain and walking difficulty. Dr. Beight indicated the possibility that surgery on the ankle might be required to release the nerve. He concluded that Friess had the following restrictions and limitations: in an 8–hour work day, she could: 1) stand less than 1 hour; 2) sit from 5–8 hours; 3) walk less than 1 hour; 4) and drive 3–5 hours. He found that Friess could climb only occasionally, but could bend, squat, reach, kneel, crawl, and use her right foot continuously or at least frequently. Dr. Beight found that Friess had no mental or nervous limitations. He indicated that Friess could lift or carry ten pounds maximum and occasionally small objects, a level of capacity identified on the form as "sedentary work."

In his written evaluation, Dr. Beight could not say when he expected Friess to resume working. He could not say when her condition might improve. In fact, he reported that Friess had probably achieved maximum medical improvement.

On December 13, 1996, Reliance denied the claim. The decision was based on the administrative record submitted with the Motion for Summary Judgment, including:

7. Magnetic Resonance Imaging (MRI): Technique used to image internal structures of the body, particularly soft tissues. Used because the images are often superior to normal x-rays. *See Medical Dictionary, at* http://www.medical-dictionary.com (last visited Nov. 20, 2000).

8. Electromyography (EMG): A test which measures muscle response to nerve stimulation. Used to evaluate muscle weakness and to determine if weakness is related to muscles themselves or a problem with the nerves that supply the muscles. *See Medical Dictionary, at* http://www.medical-dictionary.com (last visited Nov. 20, 2000).

9. Defendant's Motion for Summary Judgment, Exhibit E.

10. Defendant's Motion for Summary Judgment, Exhibit D.

11. Defendant's Motion for Summary Judgment, Exhibit F.

12. The peroneal nerve is the lateral of two branches of the sciatic nerve. It provides motor and sensory innervation to parts of the leg and foot. *See Medical Dictionary, at* http://www.medical-dictionary.com (last visited Nov. 20, 2000).

13. Defendant's Motion to Summary Judgment, Exhibit H. The form appears to be date-stamped twice, indicating receipt on both January 26, 1996 and May 31, 1996.

treatment notes from Drs. Markmann and Beight; the x-rays films taken while Friess was under Dr. Peff's care; the MRI report from Dr. Solanki; the EMG report from Dr. Grossinger; and the evaluation form filled out by Dr. Beight in 1996. Reliance did not order an independent medical examination of Friess. The record apparently does not include any expert opinions on the medical evaluations. The record on which Reliance based its denial did not include information from Nazareth Hospital, where Friess was taken immediately following the accident at work, nor from Dr. Peff, who first treated Friess for her injury.

The parties dispute the reasons for the absence of Dr. Peff's records from the administrative record. Friess contends that Dr. Peff did not respond because Reliance made an error in its request for records. Reliance sent a written request to Dr. Peff dated October 23, 1996.[14] In that request, Reliance asked Dr. Peff to provide copies of all medical treatment records "for the period from May 1, 1995 to present." Friess broke her ankle in May of 1994. She was no longer in Dr. Peff's care by May of 1995. Because Reliance did not request records from the relevant time period, Friess maintains, Dr. Peff did not respond and Reliance lacked information critical to it decision.

Reliance points out that the Policy places the burden of producing medical records on Friess, providing that benefits will be paid "if an Insured ... submits satisfactory proof of Total Disability to us." In its reply brief, Reliance included a letter sent to Friess on October 25, 1996 informing her that the medical information necessary to continue processing her claim had not been received.[15] The letter stated that Reliance had requested information from Dr. Peff and Dr. Grossinger, and would not continue to process the application until a response was received. The letter also stated: "if you have additional

medical information not previously supplied, please forward a copy for our review." Despite the October 23, 1996 request to Dr. Peff and the October 25, 1996 notice to Friess, Reliance never received records from Dr. Peff. Reliance made its December 13, 1996 decision to deny benefits based on an administrative record that contained no medical documentation made prior to November 28, 1994, although the ankle injury occurred in May of 1994.

Friess claims that she attempted to appeal the December 1996 decision, and was again denied. On October 1, 1999, Friess filed suit in the Philadelphia County Court of Common Pleas. Reliance properly removed the action to federal court.

## Summary Judgment Standard

Summary judgment is proper where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The court should determine whether there are factual issues that merit a trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate if no factual issues exist and the only issues before the court are legal. *See Sempier v. Johnson and Higgins*, 45 F.3d 724, 727 (3d Cir.1995).

At summary judgment, the nonmoving party receives the benefit of all reasonable inferences. *See Sempier*, 45 F.3d at 727. The motion should be granted if the record taken as a whole "could not lead a rational trier of fact to find for the nonmoving party, [and] there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538.

**14.** Answer to Defendant's Motion for Summary Judgment, Exhibit B.

**15.** Defendant's Reply Brief in Support of its Motion for Summary Judgment, Exhibit A.

### Standard of Review for Denial of Benefits under ERISA

■ The ERISA statute itself does not dictate a standard of review. However, the Supreme Court addressed the issue in *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), and determined that:

> a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.... Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a facto[r] in determining whether there is an abuse of discretion.

*Id.* at 115, 109 S.Ct. 948 (citation omitted). Under *Firestone,* when a plan grants its administrator discretionary authority, courts should limit review of the administrator's decision to abuse of discretion. *Firestone* also instructs that a discretionary administrator's conflict of interest should influence the amount of deference a court shows in its review of the decision under the abuse of discretion standard.

■ The Third Circuit has subsequently held that when the language of a plan gives the administrator discretionary authority, courts must apply the arbitrary and capricious standard of review.[16] *See Abnathya v. Hoffmann–La Roche, Inc.,* 2 F.3d 40, 44–45 (3d Cir.1993). Under that highly deferential standard of review, a court must defer to the administrator's decision unless the decision "is not clearly supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan." *Id.* at 41. The discretion required to trigger the arbitrary and capricious standard of

review can be express or implied from the plan's terms. *See Luby v. Teamsters Health Welfare and Pension Trust Funds,* 944 F.2d 1176, 1180 (3d Cir.1991).

■ The Courts of Appeals have gone in somewhat different directions in their efforts to interpret *Firestone's* instruction that a conflict of interest should be a "factor" in determining the level of deference shown to a discretionary administrator. The Third Circuit recently held that when an insurance company both insures and administers benefits, it is generally acting under a conflict of interest that warrants a heightened form of the arbitrary and capricious review standard. *See Pinto v. Reliance Standard Life Insurance Co.,* 214 F.3d 377, 378 (3d Cir.2000). While recognizing that particular circumstances could ameliorate the inherent conflict, the Third Circuit in *Pinto* recognized that the typical insurance company is structured so that the payment of claims directly affect its profits. Given that self interest, "there would seem to be insufficient incentive for the carrier to treat borderline cases ... with the level of attentiveness and solicitude that Congress imagined when it created ERISA 'fiduciaries.'" *Id.* at 388. The Third Circuit concluded that a heightened standard is appropriate when reviewing benefit denials of insurance companies that pay ERISA benefits out of their own funds. *See Id.* at 390.

In *Pinto,* the Third Circuit adopted the "sliding scale" approach to review under a "heightened" arbitrary and capricious standard. To best reconcile *Firestone's* dual commands, the Third Circuit concluded, the arbitrary and capricious standard cannot be abandoned even in the presence of a conflict that threatens to seriously bias the administrator's decision. Rather, the intensity of review should increase in proportion to the intensity of the conflict. *See Pinto,* 214 F.3d at 393. The Third

---

16. The "arbitrary and capricious" standard is essentially the same as the "abuse of discretion" standard. *See Abnathya v. Hoffmann–La Roche, Inc.,* 2 F.3d 40, 45, n. 4 (3d Cir. 1993). *See also Nazay v. Miller,* 949 F.2d 1323, 1336 (3d Cir.1991); *Daniels v. Anchor Hocking Corp.,* 758 F.Supp. 326, 328–330 (W.D.Pa.1991).

Circuit instructed district courts to "consider the nature and degree of apparent conflicts with a view to shaping their arbitrary and capricious review." *Id.*

While the Court in *Pinto* subjected self-interested administrators to a more searching standard of arbitrary and capricious review, it refused to impose new evidentiary burdens on them. In *Pinto*, the Third Circuit made it clear that the conflicted administrator is not required to make a good faith, reasonable investigation of a claim. *See Pinto*, 214 F.3d at 394, n. 8. The Third Circuit did not suggest that the administrator has a duty to gather more information. *See Id.* Imposing such duties would effectively shift the burden of proof to the administrator. A rule that permitted such a result would be at odds with the Supreme Court's instructions to defer to the determinations of administrators vested with discretionary authority.

Rather, the proper inquiry is whether the record adequately supports the administrator's decision.[17] In *Pinto*, the Third Circuit instructed lower courts to consider not only the reasonableness of the result, but also the process by which the result was achieved. *See Pinto*, 214 F.3d at 393. Courts should scrutinize the problems in the decisionmaking process used by the self-interested administrator. "Suspicious events" raise the likelihood of self-dealing, and move review toward the stricter extreme of the arbitrary and capricious range. *See Id.* at 394.

17. Policy considerations reinforce the wisdom of focusing the inquiry on the sufficiency of the record. Such an approach eliminates the need for the district court to engage in factfinding, an exercise that would discourage the parties from assembling evidence at the administrator's level, where evidence is most easily and most efficiently assembled. *See Vega v. National Life Insurance Services*, 188 F.3d 287, 298 (5th Cir.1999).

18. The district court also may find sufficient evidence in the record to conclude that review under the heightened standard is required. *Pinto*, 214 F.3d at 395.

To arrive at the proper standard of review, the district court must make a finding on the extent to which conflicts of interest warrant increased scrutiny. *Pinto* held that the district court, while forbidden from expanding the administrative record on the historic facts that informed the administrator's decision, may take evidence regarding the conflict of interest and ways in which the conflict may have influenced that decision.[18] *See Pinto*, 214 F.3d at 395. The Third Circuit described the type of evidence the court may consider when evaluating the seriousness of the conflict: the sophistication of the parties, the information accessible to the parties, the exact financial relationship between the insurer and the employer company, the current status of the fiduciary, and the stability of the employer company.[19] *Id.* at 392. Such evidence equips the district court to review the contested decision under an "arbitrary and capricious" standard heightened according to the potency of the conflict.

### Application

If the Policy grants discretionary authority to Reliance, its decision to deny Friess benefits must be reviewed under the arbitrary and capricious standard. The Policy does not contain an express grant of discretionary authority to the administrator, Reliance; rather, it provides that Reliance will pay benefits if the insured submits "satisfactory proof" of total disability. The grant of discretion in the policy does not need to be explicit to trig-

19. Defendant's Motion for Summary Judgment indicates that Friess's former employer, Woodward and Lothrop, ceased operations in 1996. Some courts assume that an employer's reputational interest in fairly settling the claims of its employees may mitigate potential conflicts, as the employer would come under pressure to discontinue a plan that was highly unpopular with its employees. Here, Woodward and Lothrop cannot be counted on to police Reliance's temptation to self deal.

ger the arbitrary and capricious review standard. The Third Circuit has recognized that discretionary authority may be implied in a plan's terms even if not granted expressly. *See Luby,* 944 F.2d at 1180.

The Third Circuit in *Pinto* found discretionary authority conveyed in the exact "satisfactory proof" language used in the Policy. Considering a provision requiring submission of satisfactory proof of total disability, the Third Circuit concluded: "It is undisputed that Reliance Standard had discretion to interpret the plan." *Pinto,* 214 F.3d at 379.[20] The identical language in the Policy before this court, therefore, invests Reliance with discretion over benefit determinations.

■ While Reliance has discretion, if its judgment is compromised by conflicts of interest, the highly deferential standard of arbitrary and capricious review must be adapted. Conflicts must be factored into the deference shown to the administrator's determination. In this case, Woodward and Lothrop paid Reliance to fund, interpret, and administer its LTD plan. In *Pinto,* the Third Circuit concluded that such an arrangement "generally presents a conflict and thus invites a heightened standard of review." *Pinto,* 214 F.3d at 383. Simply by the terms of its arrangement with Woodward and Lothrop, Reliance has a potential conflict of interest.

■ In determining the influence of the potential conflict on the decision to deny Friess LTD benefits, I must consider

the process by which Reliance reached that decision. *Pinto* does not impose on Reliance a duty to conduct a good faith, reasonable investigation; however, it does invite the conclusion that a decision based on inadequate information might have been arbitrary and capricious. Procedural anomalies indicating a biased review process help the court determine how much to lessen its deference to the administrator's decision.

Overall, it seems that Reliance may have conducted an unreasonably lax investigation into Friess' claim. For example, the record indicates that its effort to reach Dr. Peff, the first doctor to treat Friess, amounted to a single letter containing a major error. While Reliance made it clear to Friess that she was responsible for submitting additional medical information not already supplied, it may have been reasonable to think that Reliance had undertaken to contact Dr. Peff on its own. As Dr. Peff did not respond to the erroneous letter, Reliance may have lacked adequate medical information on the crucial period of time immediately following Friess's May 1994 injury.

In addition, Reliance did not undertake an independent medical review of Friess' condition. While Reliance is not required to order an independent examination, the failure to examine may indicate an inattentive process. Also, Reliance did not credit the Social Security Administration's finding that Friess was disabled.[21] The Court

**20.** Courts in this district and in other circuits have concluded that this exact "satisfactory proof" language confers discretion on the administrator. *See, e.g., Marques v. Reliance Standard Life Insurance Co.,* No. CIV.A. 99–2033, 1999 WL 1017475, at *2 (E.D.Pa. Nov.1, 1999) (Relying on *Luby* to infer discretion from the "satisfactory proof" language); *Landau v. Reliance Standard Life Insurance Co.,* No. CIV.A. 98–903, 1999 WL 46585 at *4–5 (E.D.Pa. Jan.13, 1999); *Sciarra v. Reliance Standard Life Insurance Co.,* No. CIV.A. 97–1363, 1998 WL 564481 at *7–8 (E.D.Pa. Aug.26, 1998) (Finding that the phrase "satisfactory proof" confers discretionary authority on Reliance to determine eligibility for LTD benefits). *See also Yeager v. Reliance Stan-*

*dard Life Insurance Co.,* 88 F.3d 376, 381 (6th Cir.1996); *Wilcox v. Reliance Standard Life Insurance Co.,* No. 98–1036, 1999 WL 170411 at *2 (4th Cir. Mar.23, 1999) (unpublished opinion) ("Only the most tortured reading of the language in Reliance's 'Insuring Clause' could lead to a conclusion that the plan in this case is not vested with the discretionary authority to determine eligibility for benefits.").

**21.** Reliance argues in its Motion for Summary Judgment that the SSA determination was not a part of the administrative record on which it made its December 1996 decision to deny benefits. Friess learned of the favorable decision from the SSA in April 1999, months

in *Pinto* actually observed that Reliance, also a party to the *Pinto* case, "places significant trust in the SSA process." *Pinto*, 214 F.3d at 393. Finally, Reliance may have used selectively the statement made by Dr. Beight, Friess' attending physician. Reliance concludes that Dr. Beight has certified Friess for sedentary work, yet fails to credit both his inability to say when she might possibly return to work, and his conclusion that Friess probably has reached maximum recovery. Procedural anomalies such as these, *Pinto* suggests, could push a court to the "far end of the arbitrary and capricious 'range,'" causing the court to examine the administrative record with great skepticism. *Pinto*, 214 F.3d at 393.

### Conclusion

Summary judgment must be denied if a reasonable factfinder could conclude that Reliance's decision was the result of self-dealing instead of the result of a trustee carefully exercising its fiduciary duty to Mary Friess. *See Pinto*, 214 F.3d at 394. Here, there appear to be genuine issues of material fact as to whether Reliance may have acted arbitrarily and capriciously under the *Pinto* standard in making its determination on the basis of an inadequate record.

On the basis of the evidence already submitted by parties, it might be possible to conclude that Reliance's conflict of interest is sufficiently potent to warrant a penetrating review of the decision to deny Friess benefits. However, I defer my conclusion to allow the parties to gather evidence on the conflict of interest and the ways in which the conflict ought to shape the heightened arbitrary and capricious standard of review described in *Pinto v. Reliance Standard Life Insurance Co.*, 214 F.3d 377 (3d Cir.2000).

Defendant's Motion for Summary Judgment is therefore denied without prejudice. An appropriate order follows.

before she filed suit against Reliance. Had she presented it to Reliance at that time as evidence of disability, Reliance could have

**AND NOW,** this Day of November, 2000, it is **ORDERED** that Defendant's Motion for Summary Judgment (Docket Entry No. 9) is **DENIED** without prejudice.

It is **FURTHER ORDERED** that the parties are authorized to take discovery until January 19, 2001 regarding the potential conflict of interest according to *Pinto v. Reliance Standard Life Insurance Co.*, 214 F.3d 377 (3d Cir.2000). The parties shall file dispositive motions no later than February 2, 2001. The parties shall file responses to dispositive motions no later than February 16, 2001.

used the SSA findings to reconsider its decision.